

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00488-CV

_____

IN THE INTEREST OF K.D., A CHILD

On Appeal from the 97th District Court
Clay County, Texas
Trial Court No. 23-039-DCFAM-0020

Before Sudderth, C.J.; Birdwell and Bassel, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

Appellants Father and Mother appeal the trial court's order terminating the parent–child relationship with their child, K.D.,[1] in this ultra-accelerated appeal.[2] The trial court found that the Department of Family and Protective Services had proved five conduct-based grounds for termination as to each parent and that termination was in K.D.'s best interest. *See* Tex. Fam. Code. Ann. § 161.001(b)(1)(D), (E), (N), (O), (P), (b)(2). Father and Mother challenge only the trial court's best interest finding. Because we hold that there was sufficient evidence to support the court's finding that the termination was in K.D.'s best interest, we will affirm.

## I. Background

Father and Mother have one child, K.D., who was ten years old in October 2024, when trial began in this case. K.D. is Father's only child. Mother also has an older daughter, K.D.'s Sister, who did not live with her.

Since K.D. was born, Father had been arrested more than 20 times in five counties and two states. Father had used methamphetamine since at least 2017. In 2023 and 2024, Mother was arrested five times related to state and federal drug

---

[1]We use relationships to the minor, fictitious names, or initials to refer to minors and to others as necessary to protect the minors' identities. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]*See* Tex. R. Jud. Admin. 6.2(a), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. F app. (requiring appellate court to dispose of appeal from judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

offenses. Mother had an ongoing history of methamphetamine use which began before K.D.'s birth.

In November 2023, the Department removed K.D. from Mother's care and filed an original petition for protection, guardianship, and termination in a suit affecting a parent–child relationship. In the affidavit attached to its petition, the Department alleged that the removal began with a report from K.D.'s school administrator after viewing the contents of K.D.'s cell phone.[3] The administrator reported that K.D. had voluntarily offered access to her cell phone, where the administrator discovered pornographic images, text messages indicating that K.D. was being neglected by Mother, and screenshots of text messages and payment app histories indicating drug-distribution activity by Mother. The administrator told the Department's representative that she believed the objectionable material was on the phone because Mother had logged in to her Google account on the phone. The administrator also told the Department's representative that K.D. had informed her that she was hoarding water bottles so that she would have enough drinking water for the upcoming Thanksgiving break.

---

[3]The trial court took judicial notice of its case file. Because the trial court took judicial notice of the affidavit, we acknowledge the existence of it but do not take the allegations within as true. *See In re M.R.*, No. 02-22-00118-CV, 2022 WL 4545534, at *6 (Tex. App.—Fort Worth Sept. 29, 2022, no. pet.) (mem. op.).

After a one-day bench trial in October 2024, the trial court terminated Father's and Mother's parent–child relationships with K.D. Father and Mother were both incarcerated and participated remotely on the day of trial.

## II. Discussion

To terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy at least one statutory predicate ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. *Id.* § 161.001(b)(1), (2); *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

Neither Father nor Mother challenges the legal or factual sufficiency of the trial court's predicate findings. Therefore, we need address only the trial court's best interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2). Further, Mother challenges only the legal sufficiency, not the factual sufficiency, of that finding. Father challenges only the factual sufficiency, not the legal sufficiency. For ease of discussion, we will combine our recitation of the applicable facts but perform individual legal analyses.

### A. Standard of Review

When reviewing the sufficiency of termination findings, we must determine whether the evidence was clear and convincing, that is, whether the evidence "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.". Tex. Fam. Code Ann. § 101.007; *In re Z.N.*,

4

602 S.W.3d 541, 545 (Tex. 2020). Both legal and factual sufficiency turn on this question; the distinction between the two sufficiency analyses "lies in the extent to which disputed evidence contrary to a finding may be considered. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

In our legal sufficiency analysis, we view the evidence "in the light most favorable to the finding," assuming the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so and disregarding all evidence that a reasonable factfinder could have disbelieved. *Z.N.*, 602 S.W.3d at 545; *see A.C.*, 560 S.W.3d at 630–31.

"Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding" to determine if "in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *A.C.*, 560 S.W.3d at 631; *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("When the factual sufficiency of the evidence is challenged, only then is disputed or conflicting evidence under review."); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

The two sufficiency determinations overlap in many respects; if the evidence is factually sufficient, it is necessarily legally sufficient. *In re A.S.*, No. 02-16-00076-CV, 2016 WL 3364838, at *7 (Tex. App.—Fort Worth June 16, 2016, no pet.) (mem. op.).

5

**B. K.D.'s Best Interest**

The best interest inquiry "is child-centered and focuses on the child's well-being, safety, and development." *A.C.*, 560 S.W.3d at 631; *see In re A.S.*, No. 02-19-00429-CV, 2020 WL 2071944, at *7 (Tex. App.—Fort Worth Apr. 30, 2020, pet. denied) (mem. op.). In our review of a best interest finding, we consider several factors, including (1) the emotional and physical needs of the child; (2) the stability of the home or proposed placement; (3) the emotional and physical danger to the child; (4) the plans for the child by those seeking custody; (5) the desires of the child; (6) the acts or omissions of the parent indicating that the parent–child relationship is not a proper one; (7) any excuse for the acts or omissions of the parent; (8) the parental abilities of the parents; and (9) the programs available to assist the parents to promote the child's best interest. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307 (listing additional factors). "Evidence that supports the statutory predicate findings may also be probative of the child's best interest." *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *14 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.).

In our best interest analysis, we will recount the evidence relevant to each of the *Holley* factors, but we will combine them topically for ease of discussion.

### 1. The emotional and physical danger to the child; acts or omissions that may indicate that the existing parent–child relationship is not a proper one

In a previous removal in 2021, Sister had temporary custody of K.D. under a safety plan because Mother had been using controlled substances. Under that previous plan, Mother was allowed visits with K.D., provided they were supervised by Sister. Sister reported to local police that Mother had abducted K.D. during a supervised visit at Mother's place of work.

Upon removal by the Department in 2023, K.D. lived with Aunt, who is Mother's sister. The Department informed Aunt about concerns with the cleanliness of Aunt's home. The Department also expressed concerns that while K.D. lived with Aunt, she was bullied at school because she "went to school dirty and smelly" and was hoarding food because she was not being fed at home. Before the Department acted on these concerns, Aunt voluntarily returned K.D. to the Department, which led to K.D.'s brief return to Mother until Mother's arrest, and then K.D. was placed with a foster family.

Because they were both incarcerated at the time of trial, neither Mother nor Father would have been able to take immediate possession of K.D. Before they were incarcerated, both Mother and Father had Department-supervised visitation with K.D. According to the Department's permanency specialist, Mother and Father demonstrated appropriate behavior during visitations and interacted appropriately with K.D.

At trial, Father did not remember K.D.'s date or year of birth but agreed that she was ten years old. Father estimated that he had been incarcerated for five of those years, including all but one month during the pendency of the underlying removal case. Mother estimated that he had been active in K.D.'s life for a total of three years or less.

When Father was asked whether a parent's use of methamphetamine endangers a child, he answered in the negative, clarifying it was "no worse than pills." Asked if he thought the use of pills was harmful, he again answered in the negative. Asked for an example of when it would not be harmful for a child to have a parent who used methamphetamine, he invoked his Fifth Amendment right not to testify.[4] Father again invoked his Fifth Amendment right not to testify when asked whether it was "good or bad" for a parent to be involved in the delivery or sale of methamphetamine. Father also invoked his Fifth Amendment right in response to questions about whether he had used methamphetamine within two months after his release from prison and whether he had used methamphetamine during the pendency of the case.

During the pendency of the case, Mother tested positive for methamphetamine on two random drug screens and missed two screens that were presumed positive.

---

[4]When a party in a civil case, including a termination-of-parental-rights case, invokes the Fifth Amendment, the factfinder may draw an adverse inference against him from that invocation. *See In re A.H.*, No. 02-17-00222-CV, 2017 WL 5180785, at *4 (Tex. App.—Fort Worth Nov. 9, 2017, pet. denied) (per curiam) (mem. op.).

Mother pled the Fifth Amendment in response to questions about when she had last used methamphetamine, whether she had used methamphetamine during the pendency of the case, and whether she and Father had ever used drugs together. Mother also pled the Fifth Amendment when asked whether she facilitated a drug sale to a confidential informant, personally handed methamphetamine to a confidential informant, and pled guilty to two federal drug charges related to possession with intent to deliver methamphetamine before being placed on probation on state-level charges.

### 2. The child's desires

In a report by the court–appointed special advocate, K.D. stated that she loved Mother and Father, wanted a continued relationship with them, and wanted to return to Mother. However, Mother acknowledged that, because she was incarcerated and awaiting sentencing, she would have been unable to care for K.D., and that, before she was incarcerated, she had not maintained a safe and stable home for K.D. K.D. had also expressed concern to her permanency specialist about returning to Aunt's home because she had been bullied in school, so she did not want to return to live with Aunt.

### 3. The child's emotional and physical needs and the Department's plans and the stability of the proposed placement

The Department planned to facilitate K.D.'s adoption by Foster Mother, who had expressed interest in adoption. Foster Mother and K.D. had a strong familial

relationship. Foster Mother had other children in the household whom she had adopted.

In her foster placement, K.D. socialized appropriately at school and did not complain of being bullied. K.D. enjoyed her school, was at an appropriate grade level for her age, and had special accommodations in place to aid her education. K.D. received therapy to address trauma associated with her removal and to establish boundaries to avoid being bullied. In her foster placement, K.D. had not been going to school unbathed or hungry. K.D had visitation with Sister, and the foster family had expressed willingness to continue the visits with Sister if they were to adopt K.D.

### 4. The parents' plans and the stability of the home; any excuse for the acts or omissions of the parent

Father was married at the time of trial. He and his wife owned a house that was being renovated after it was vandalized while he was in jail. Father testified that he did not know the progress of the renovation. During the renovations, his wife moved to a rental house in another city. Father testified that he lived there with his wife. However, Father's wife told the Department's permanency specialist that Father did not live there and refused to grant the permanency specialist access for a home visit for review as a potential placement for K.D.

Father testified that K.D. had previously spent substantial time with his wife at the rental house and that both Mother and K.D. had lived there for a time. Mother

10

testified that she and K.D. had lived there only a short time and never with Father or his wife.

During the trial, Father was under indictment for organized criminal activity with intent to commit theft, unlawful possession of a firearm by a felon, and unauthorized use of a vehicle. Father stated that he intended to plead not guilty to the charges against him and to request a jury trial. He asserted his Fifth Amendment right not to testify when asked whether he had a firearm in his possession when he was arrested and whether he had stolen a vehicle in another county. Father, a convicted felon, was also being held on a parole violation at the time of trial.

Father's plan for K.D.'s long-term care was for her to be placed with either him or Mother once they were no longer incarcerated. He did not offer further explanation. Father admitted, however, that at a pretrial hearing, he had testified that he thought Mother should not be awarded custody.

Father had filled out a form for selection of his wife as a placement, though he did not recall filling out the form. Even though K.D. had never lived with Father or his wife, Father felt his wife would be a good candidate for a placement because "[a]nywhere's better than where she's at." Nevertheless, his wife had refused to submit to a home inspection by the Department.

Mother had lived at the home Father claimed as his residence until she was incarcerated, although not while Father or his wife lived there. Mother testified that even before her arrest she had not maintained a safe and stable home for K.D.

11

Mother had previously testified that her plan was to have K.D. remain in her foster placement, without compensation and without Department involvement, while Mother "[got] her life in order."

Both parents stated, and the Department agreed, that at the time of the trial, K.D. could not reasonably be returned to either parent because they were incarcerated. Neither parent testified to a probable date of release.

In his brief, Father argues that he had sustained a head injury and that the injury should excuse his conduct. However, Father declined to testify about his injury at trial, stating that he did not remember it and did not want to talk about it. The applicable testimony that is reflected in the record is as follows:

> Q.  Would you agree with -- would you agree with me that your head injury affects your ability to –
>
> A.  I –
>
> The Court: Okay. Wait. We're talking over each other again. Mr. [Father] –
>
> A.  Yes, sir.
>
> The Court: -- I need you to put your hand down because I think that's interfering with your voice carrying.
>
> A.  Yes, sir.
>
> The Court: Thank you.
>
> Q.  Was that yes, sir, the answer to my question?
>
> A.  Yes, sir.

Father's brief suggests that his "yes" answer to an unfinished question weighs in his favor as to this factor. We disagree.

### 5. Legal sufficiency analysis as to Mother

When we consider the evidence in the light most favorable to the judgment, we conclude that the evidence is legally sufficient to support the trial court's best interest finding as to Mother. The evidence of Mother's criminal history, lack of stability, history of drug use—particularly methamphetamine—and lack of a concrete plan to provide a stable environment in the future weigh heavily in favor of the trial court's finding that terminating Mother's parent–child relationship with K.D. was in K.D.'s best interest. *See* Tex. Fam. Code. Ann. § 161.001(b)(2); *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.).

### 6. Factual sufficiency analysis as to Father

When we weigh the disputed evidence contrary to the best interest finding against all the evidence favoring the finding, we determine, in light of the entire record, the disputed evidence is not so significant that the trial court could not have formed a firm belief or conviction that the best interest finding was true as to Father. *A.C.*, 560 S.W.3d at 631.

At trial, Father espoused the position that the use of controlled substances, methamphetamine or pills, is not harmful for a child. Contrary to Father's position, we hold that a parent's use or sale of methamphetamine is never in a child's best interest. *See In re O.S.*, No. 02-24-00295-CV, 2024 WL 4778360, at *13 (Tex. App.—

Fort Worth Nov. 14, 2024, pet. denied) (mem. op.) (holding methamphetamine use posed a danger to the child and endangered her emotional and physical needs); *In re S.C.*, No. 02-18-00422-CV, 2019 WL 2455612, at *2–3 (Tex. App.—Fort Worth June 13, 2019, pet. denied) (mem. op.) (detailing chronic methamphetamine use supporting best interest finding in termination); *In re D.F.*, No. 2-07-056-CV, 2008 WL 820368, at *7 (Tex. App.—Fort Worth Mar. 27, 2008, no pet.) (per curiam) (mem. op.) (similar).

Weighing the evidence in favor of the trial court's best interest finding, such as Father's history of criminality and drug use—including methamphetamine—and lack of long-term plan for stability, against conflicting evidence of Father's appropriate interactions during supervised visitations, K.D.'s stated desire to return to her parents, and Father's alleged excuse for his conduct, we find the evidence still weighed heavily in favor of the trial court's finding that terminating Father's parent–child relationship with K.D. was in K.D.'s best interest. *See* Tex. Fam. Code. Ann. § 161.001(b)(2); *S.B.*, 207 S.W.3d at 887–88.

### III. Conclusion

The record contains sufficient evidence to allow a reasonable factfinder to form a firm belief or conviction that termination of Mother's and Father's parental rights to K.D. was in K.D.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *S.B.*, 207 S.W.3d at 887–88. Having overruled Father's and Mother's only issues, we affirm the trial court's judgment. *See* Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: April 10, 2025